**LAW OFFICES OF KIMBERLY A. ECKERT**
1050 East Southern Avenue Suite A3
Tempe, Arizona  85282
(480) 456-4497 Fax (866) 583-6073
Kimberly A. Eckert – 015040
keckert@arizlaw.biz
**Attorney for Plaintiff**

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| John Coby II, an individual,<br><br>           Plaintiff,<br><br>v.<br><br>City of Tombstone, a municipality, Tombstone Marshal's Office, Marshal Jim Adams in his official capacity and in his individual capacity, acting under color of law, Constance Baker, acting under color of law, Marshall Sharp, acting under color of law, Rebecca Larsen McKeown, acting under color of law, Jeff Garcia, acting under color of law, Alicia Via, an individual, KnightWatch K9 LLC, an Arizona limited liability company, All Phase K9 Tactical, a trade name for Consuella Via, Consuella Via, an individual, Got Your Six K9 Rescue, Inc., a Arizona corporation,<br><br>           Defendants. | Case No.<br><br>**Complaint**<br><br>**(Jury trial requested)** |

Plaintiff John Coby II, hereby files his Complaint against Defendants and alleges as follows:

1.     Plaintiff John Coby II ("Coby") is an individual and at all relevant times was a resident of Pima County, Arizona.

2.     Defendant City of Tombstone ("Tombstone") is a municipality and is responsible for the actions of its employees and agents, including but not limited to the Tombstone Marshal's Office ("Marshal's Office") and its employees and agents. The Marshal's Office was formed either as jural or non-jural entity and is liable due to actions taken in this matter and is responsible for the actions of its employees and agents. Defendant Marshal Jim Adams ("Adams") in his official capacity as the person responsible for the actions of the Tombstone Marshal's Office.

3.     Defendant Jim Adams is also named in his individual capacity and was acting under color of law at all relevant times, Defendants Constance Baker ("Baker"), Marshall Sharp ("Sharp"), Rebecca Larsen McKeown ("McKeown"), and Jeff Garcia ("Garcia"), were at all relevant times, employees and/or agents of Defendants City of Tombstone and/or Tombstone Marshal's Office, and are residents of Arizona.

4.     Defendants Alicia Via ("A. Via") and Consuella Via("C. Via") are individuals and are residents of Arizona. Defendant All Phase K9 Tactical ("All Phase"), a trade name for Consuella Via, an individual.

5.     Defendant KnightWatch K9 LLC ("Knightwatch"), is an Arizona limited liability company and was doing business in Arizona at all relevant times herein.

6.     Defendant Got Your Six K9 Rescue, Inc. ("Got Your") , is an Arizona corporation and was doing business in Arizona at all relevant times herein.

2

7.    The acts or omissions giving rise to the claim occurred throughout Arizona, largely in Cochise County, however, also occurred in other counties, all of which are located in the District of Arizona.  Venue is therefore appropriate.

8.    This Court has original jurisdiction over all civil actions arising under the Constitution of the United States, as well as laws and treaties of the United States pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 et seq..  This action is in part based on alleged constitutional violations and thus, jurisdiction in Arizona District Court is appropriate.  The Arizona District Court also has supplemental jurisdiction over all other related claims which stem from the same case or controversy under Article III of the United States Constitution. *See* 28 U.S.C. §§ 1331 and 1367.

9.    Plaintiff demands a jury trial on all issues triable by a jury.

10.    The required Defendants as well as other Defendants were served with a Notice of Claim under A.R.S. §12-281.01 and the time for the required Defendants to respond has exceed 60 days and/or a response denying the claim was received.

11.    Plaintiff John Coby II is a sworn police officer in the State of Arizona as well as a member of the Arizona National Guard. At this time, he is employed by the Tombstone Marshal's Office.

12.    Mr. Coby was attacked by his assigned canine officer on November 19, 2024, causing serious injuries. He had to be air-evacuated due to the serious and severe nature of the injuries.  It has been learned that the dog was placed into service despite a history of attacks on its handler or handlers. The canine's name and records were falsified

so that Baker and her company could be paid for the services with the agreement of Tombstone.

13.    Mr. Coby suffered from extreme pain, has incurred medical costs, permanent scarring, and is believed to now be prevented from working in his future field of commercial aviation due to his injuries. He also could not attend an Army leadership school in January which hindered his promotional opportunities as it is required for the rank. The extent of the medical bills is still unknown. He has suffered from lost work and time and has suffered lost wages.

14.    As part of retaliation supporting punitive damages and other claims, Coby was told by Adams and Garcia that if he filed a lawsuit, his employment would be terminated. On January 24, 2025, Mr. Coby was told again by Adams that if he pursues civil action against the City, per the Mayor's policy, he will be fired.

15.    Defendant Baker was an employee of the Tombstone Marshal's office and also ran a private company called KnightWatch K9, which provided canines to law enforcement.  Defendant Adams hired Baker and KnightWatch to supply dogs and train them and their handlers.  No one vetted this group, nor did they send anything out for bid. There was no supervision of the program by the Defendants' Tombstone or Marshal's Office despite the officers being subjected to the animals.

16.    It was determined that Baker and her company bought dogs to sell and supply to Tombstone that she knew were dangerous, changed their records and names,

4

and then lied to try and deflect blame. She worked with Sharp and McKeown to try and place blame on Coby for the attack on him and the shooting of his dog.

17.    On November 6, 2024, Coby went to pick up K9 Caine which was to replace K9 Cupcake due to Cupcake biting Baker. When Baker brought Caine out, Mr. Coby immediately observed him pulling excessively on the leash and Baker had trouble controlling him. The dog slipped out of his collar and began running around the property.

18.    Coby and Baker went after him, trying to get a hold of him to put his collar back on, and finally was able to engage him playing a game of tug of war with a toy. While he was distracted pulling on the toy, they were able to get a collar and leash on him. Baker then put him in the kennel in Coby's patrol truck.

19.    Coby told Baker the dog was not obedience trained, and he asked how he could certify with this dog in a week. Baker stated that he should come to K9 training that night. While attempting to get the dog out of his truck, the dog jumped down from the truck and immediately began jumping backwards and doing extreme head shakes, trying to slip his collar.

20.    It was clear that this dog was never trained on a leash and had no obedience training. The dog would not sit, respond to the command phooey, (which is stop) or answer to his name Caine. Coby was able to get the dog back into the truck by throwing a toy back into the kennel, which he followed. He immediately took the dog back to the station to return the dog.

21.    Coby met Tim Defoor and their evidence coordinator Lecia Watkins in the parking lot and explained the frustrations.  Watkins looked in the window and called the dog's name and he did not respond but only continued to sit and stare. Watkins also concluded that was not the dog's name and Coby looked up the picture of Caine provided to  Adams from Baker which was posted on 'X' formerly twitter. It was clear these are two different dogs.

22.    Coby told Baker to take the dog back. She laughed and told him not to be scared of the dog and to follow her to the training. She assured him that the dog was Caine. Coby followed her to the training site and deployed Caine around a parked car that was out of service. He immediately jumped on the hood and the roof of the car.

23.    Baker stated that the dog did not know the basic commands and instead claimed he knew "gets dope" as she explained in a German accent. She admitted the dog had no obedience training. Coby again became extremely upset and took the dog back to his truck by letting him bite his toy and Coby pulling the toy to the truck essentially getting him to follow.

24.    Baker wanted to try again, and this time, Caine became fixated on Sharp wanting to attack him. Coby was struggling to hold the leash and tried pulling the dog back to the truck when he turned and bit Coby twice, once on his right inner thigh and again on his left inner thigh. The bite was photographed and measured to show the swelling and monitor for infection.

6

25.    Baker minimized the seriousness of the bite and stated to investigators that the bite was so small Coby needed to circle it just to see it.

26.    On November 6th, 2024, after the bites, Baker instructed him to walk the dog around the building then to put the dog in the truck. Baker then tried to blame Coby for not being able to control the dog, telling him to "You go to the gym all the time I thought you could handle him."

27.    Baker further lied to investigators stating Coby celebrated the dog bite by commenting 'I have my badge as a K9 handler now,' a statement Coby did not make.

28.    Coby called Garcia and informed him of the dog bites and the two different dogs and he said he would talk to Baker about it. Baker misled investigators saying she called Garcia to inform him of the bite but was unreachable until the next day. Baker then provided Garcia with a rabies record for Caine and Coby immediately saw the dog's name as Boris. Baker told Garcia she changed the dog's name and she does it all the time, and that is a "common practice." However, Garcia told Coby that the name Boris was probably on the paperwork when the dog was flown in from Holland. Coby realized the rabies record was photo-shopped and there was missing information.

29.    Upon completion of the Handler Course on November 18, 2024, Baker and Sharp submitted a falsified Arizona POST training form by inaccurately logging an additional 40 hours of training. This resulted in Sharp's records reflecting 80 hours of participation in what was, in fact, a 40-hour course. Both Baker and Adams confirmed in their statements to investigators that the handler course was only 40 hours in duration.

7

Additionally, the POST training number and attendance dates on Sharp's form are identical to those on Coby's, further indicating that the course duration was misrepresented. This falsification supports evidence of coordinated fraudulent activity between Baker and Sharp.

31.     On December 3, 2024, KnightWatchK9 gave Coby's first dog Caine to Rene Ordonez who works for Maricopa County PD. Ordonez was in the handler course with Coby. Ordonez reached out to the trainers at Border Patrol and was told they are "staying out of the case" because they were instructed to do so and to stay away from the civil suit.

32.     The Border Patrol K9 Trainer told Ordonez that according to Caine's training records, Caine was afraid of people, and afraid of the leash, and becomes aggressive. The Trainer told Ordonez that every dog that comes from Border Patrol has marijuana imprinted. Caine and Hawk (new dog) both had marijuana imprinted and Baker knew it. Baker also failed to disclose to Ordonez that Caine attacked Coby.

33.     Baker and Knight WatchK9 knew that the dogs had a violent history and were marijuana imprinted and changed their names to give the dogs a new identity. Ordonez gave Caine back to Knight WatchK9 and is on his fourth dog from them.

34.     Coby was then given Hawk.  Hawk's medical record was also whited out. Baker said Alicia Via does that to not let Baker know where she gets the dogs from due to competition. She stated that A. Via did not want people to know where the dogs came from to keep vendors from going elsewhere.

8

35.    On November 19, 2024, after having Hawk for only 10 days, Hawk attacked Coby.

36.    Coby tried to get the dog off of him but could not.  In an effort to get Hawk to release his bite, Coby threw Hawk's toy on the ground, attempting to redirect the dog's attention. He simultaneously issued verbal commands such as "loose" and "phuey." According to the Cochise County investigation, audio recovered from the Tombstone Marshal's surveillance cameras captured these commands. When verbal commands failed, Coby attempted to distract Hawk by spraying air freshener in his face, all while continuing to issue the same verbal cues. Despite these efforts, Hawk maintained his grip. Coby realized that pulling away only caused Hawk to pull back harder. In response, he relaxed his leg and stopped resisting, essentially giving Hawk control of his leg in hopes that removing the "tug-of-war" dynamic would lead Hawk to release. This strategy was also unsuccessful. Coby then tried to use the bathroom door, swinging it back and forth in an attempt to strike Hawk in the head so he would release, again repeating the verbal commands. At that point, there were over three minutes of intense and exhausting effort.

37.    Coby was forced to shoot Hawk with his service weapon due to the attack and was seriously injured as set forth below. He suffered permanent nerve damage.

38.    During Baker's interview following the incident with Hawk, on November 19, Baker and Sharp made false, unsupported accusations of abuse and heavy-handedness. Baker and Sharp both stated there was no reason to have the dog in the

station and the dog should have stayed in the vehicle because there is a kennel in the vehicle.

39.    The Tombstone Marshal K9 Policy states in Section: M (4) Handlers shall bring their K9's into the department kennel if they expect to be in the office for more than 10 Mins. It should further be noted Baker wrote the SOP and Sharp had read the SOP. Claims that the policy was not read are false due to Sharp and Bakers name being listed on the Standard Operating Procedure K9 Unit Chain of Command Structure with Baker holding the Title K9 Training Director and Sharp holding the Title Assistant K9 Director That lists both of their responsibilities. Both Baker and Sharp agreed to the roles and made it a point to identify these roles in the K9 policy. The policy was also followed by Mr. Coby.

40.    The day of the attack by Hawk, Sharp went to City Hall and started spreading false rumors that Coby was heavy-handed and told McKeown to write a letter to the Marshal saying Coby was heavy-handed. This resulted in the canine program being immediately suspended. McKeown works in public works and is frequently in City Hall. McKeown falsely stated she saw Coby swing the dog by his leash, causing him to leave the ground, approximately two weeks before the shooting. She later apologized after the notice of claim was served and offered to recant the letter.

41.    However, Coby only had Hawk for 10 days before the shooting and Hawk was about 90 lbs, and he would not be able to swing him on a leash. Baker's letter to investigators stated "Tim Defoor witnessed Coby punch Caine in the face." Tim Defoor

denies any such observation or comments. Tim Defoor never observed Coby handle either Hawk or Caine so the claim Coby punched the dog in the face is also false.

42.    Coby gave Hawk a bath because of his odor and to remove excrement from him. Baker stated she does not give dogs baths and that they are tools. The accusation that the dog sat on the couch while watching Scooby Doo was also false. Coby took a picture of the dog in the kennel while Scooby Doo was on the TV for his children. The kennel was in front of the couch again, showing Baker's attempts to place blame elsewhere to deflect from her conduct.

43.    Baker again falsely claimed that Coby was treating the dogs like house pets and made other out of context claim in an attempt to discredit his handler abilities.

44.    Courtland Rautio attended the Handler course with Coby in 2023 and worked as a handler for KnightWatch K9 in 2023. He quit because of the dog's aggressiveness and Baker's lack of empathy towards the dogs. The history is troubling; Baker's dog Noms escaped her kennel one day and killed three sheep on her property.

45.    Coby's old dog Dayak, also supplied by Baker, bit Court and the other kennel technician Traci Mayer.

46.    In 2023, Baker's ex-husband sued Baker over the KnightWatch K9 business. Baker said in a meeting that she uses her friend's nonprofit for payments because of her ex-husband. It is believed that the non-profit is called "K9 KAOS" which also works with the shelter Hawk was acquired from.

47.    The City did not obtain a bid to hire Baker's company. The company's hiring was approved by Marshal Adams, and the City was aware of it. No background or insurance was provided by Baker until after the incident.

48.    Baker walked into City Hall and gave them a $50,000.00 invoice for the dogs.

49.    Upon information and belief, Baker acquired the dogs from A. Via and C. Via/All Phase K9/Got Your Six K9 Rescue, Inc. and possibly with the assistance of K9 KAOS and they knew of the dog's history and changed the documents with Baker's knowledge placing dangerous dogs in the hands of Coby and others.

50.    Baker lied about Coby getting bit by (Hawk) during training in her letter asking Detective Luna to double check his wounds to his wrist. Coby's watch had damage on it from the attack and was taken into evidence.

51.    Coby suffered serious injuries from the dog "Hawk" while working in a work environment that was placed into motion by the Defendants as Tombstone and Marshal Adams hired Knight Watch and Baker and allowed them to operate. The Arizona Constitution guarantees that "[t]he right of action to recover damages for injuries shall never be abrogated." Ariz. Const. art. 18, § 6. Notwithstanding workers' compensation exclusivity, "the Arizona Constitution allows an employee who would otherwise be barred . . . to sue his or her employer if the employee has suffered an injury caused by the employer's wilful misconduct." *Gamez v. Brush Wellman,* Inc., 201 Ariz. 266, ¶ 5 (App. 2001); Ariz. Const. art. XVIII, § 8.

52.    As to Tombstone and anticipated claims as to state claims, a lawsuit may proceed where the employee's injury is "the result of an act done by the employer or a person employed by the employer knowingly and purposefully with the direct object of injuring another, and the act indicates a willful disregard of the life, limb or bodily safety of employees." Ariz. Const. art. XVIII, § 8.

53.    The facts here show the four elements necessary to properly plead willful misconduct: (1) the employer's willful misconduct must have been the cause of the employee's injury, (2) the willful misconduct must have been "an act done . . . knowingly and purposely with the direct object of injuring another," (3) the act that caused the injury must have been the personal act of the employer, and (4) the act must have reflected "a willful disregard of the life, limb or bodily safety of employees." *Gamez*, 201 Ariz. 266, ¶ 6 (alteration in Gamez) (quoting Ariz. Const. art. XVIII, § 8).

54.    Plaintiff was damaged due to the injuries he suffered in this matter including but not limited to, two permanent scars to his left wrist, soft tissue and permanent nerve damage to his right ankle, knee and foot, a two-by-two-inch hole in his right calf which resulted in a piece of leg missing, 16 total puncture wounds to his ankle with 2 of these punctures on his wrist, permanent scar tissue damage and four permanent scars on his left calf in the shape of Hawks teeth. As Hawk's mouth wrapped around Coby's calf, he had three stitches and a two-inch piece of the left calf sustained skin and tissue loss which resulted in no sutures due to the missing skin and as a result, a permanent indentation of the wound.

55.     Coby's medical treatment included the following: morphine and Versed in the field, and medical personnel attempted wound irrigation which caused significant pain and distress so therefore was discontinued. He was taken by ambulance to the Tombstone fire station and then air evacuated to Banner University Medical Center in Tucson. X-rays were performed on the right foot, right ankle and right tibia and fibula as well as the left wrist and forearm to evaluate for fracture and foreign body (dog teeth). Additional medical treatment followed.

56.     To be liable for an employee's actions, an employer must have control or right of control over that employee. *Engler v. Gulf Interstate Eng'g, Inc*., 227 Ariz. 486, 491 ¶ 17, 258 P.3d 304, 309 (App. 2011), aff'd, 230 Ariz. 55, 280 P.3d 599 (2012). Defendants' Tombstone and/or Marshal's Office had control over Adams, Garcia, Baker, Sharp, and McKeown.

## COUNT ONE
### 42 U.S.C. 1983/Monell
### (Defendants Tombstone, Marshal's Office, Adams, Baker, Sharp, Garcia, and McKweon)

57.     Plaintiff adopts and incorporates all the preceding paragraphs.

58.     42 U.S.C. § 1983 ("§ 1983") provides a civil remedy for the deprivation of any rights, privileges, or immunities secured by the Constitution under color of state law. As to Defendants  Adams, Baker, Sharp, Garcia and McKeown, they were acting under color of law. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996).  42 U.S.C. § 1983 is a constitutional tort which "provides that every person who, under color

of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. Section 1983 is derived from the Act of April 20, 1871." C. Antieau, Federal Civil Rights Acts: Civil Practice at 48-49 (1971).

59.     As such the cause of action must demonstrate in its prima facie case (1) that the Defendants were acting under color of law; (2) that the deprivation complained of was a right or interest secured by the federal constitution or laws; (3) that the deprivation complained of was intentional or the reasonably foreseeable result of a voluntary act or omission and (4) that the injury alleged was proximately caused by the defendant(s). J. Cook and J. Sobieski, Jr., Civil Rights Actions (1984). *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)

60.     "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Defendants were acting under color of law at all relevant times herein and are not entitled to qualified immunity based on their actions. *See Pearson v. Callahan,* 555 U.S. 223, 230-32, 235-36 (2009).

61.    Defendants violated Plaintiff's constitutional rights under the United States' Constitution, Fourteenth Amendments and Ariz. Const. art. II, § 4 as to procedural and substantive due process.

62.    "Under the Fourteenth Amendment, a person has the constitutional right to be free from a government employee affirmatively placing that person in a position of actual, particularized danger (or in a situation of actual, particularized danger that is more dangerous than the position that the person already faced) if the government employee acted with deliberate indifference to a known or obvious danger." 9th Circuit Model Jury Instructions, 9.33B. The "state may be constitutionally required to protect a plaintiff that it affirmatively places in danger by acting with deliberate indifference to a known or obvious danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quotations omitted).

63.    The City and Marshal Adams are responsible for the actions of Baker and Sharp in placing the dogs with Coby without any type of vetting or inquiry into the qualifications of Baker and her organization and the requirements for a K9 in the police department. "Deliberate indifference" requires that Plaintiff show "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Here, placing a dog in a K9 program without doing any type of vetting of the supplier or trainer is deliberate indifference.

16

64.     A "person" includes local government entities. *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 690 (1978).

65.     A local government may be sued under § 1983 for an injury inflicted solely by its employees or agents when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978).

66.     Here, Tombstone and/or Marshal's Office were well aware of what the employees and agents were doing when they allowed Baker and her company to supply dogs without any type of vetting.

67.     Further, the statement that the Mayor's policy was to terminate an employee who files a lawsuit shows that Tombstone had a policy or practice to allow a Mayor to make decisions.

68.     It is a violation of 42 U.S.C. § 1983 Civil Rights, *see Bd. of Cnty. Comm'rs of Bryan Cnty*, 520 U.S. at 405, where the municipal action is the moving force behind the plaintiff's injury if "the action taken or directed by the municipality or its authorized decision maker itself violates federal law"); municipalities' tort liability for proprietary actions is the same as private parties, *Owen*, 445 U.S. at 639-40.

69.     Defendant Tombstone had a practice or custom of allowing the Mayor and or Marshal's Office to make policy.  Alternatively, Tombstone authorized Marshal Adams

and/or Mayor to be a final policymaker such as in determining whether to provide dogs to employees and/or to fire an employee for filing a lawsuit.

70.    Qualified immunity only protects government officials "for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991). Here, there was no mistake made by the Defendants but instead, they engaged in a coordinated effort to place dogs from a company that had not been vetted and place them in the hands of Coby resulting in damages to him.

71.    Tombstone is not entitled to qualified immunity. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)

72.    Tombstone and/or Marshal's Office are liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) given the actions taken by Marshal Adams and the failure to properly vet Knight Watch and instead simply give a contract to an employee. Tombstone and/or the Marshal's Office were deliberately indifferent to the need for supervision/training within the police department. It was a pattern and practice to allow hiring of others despite inadequate supervision.

73.    The retaliation and threat to fire and that it was the Mayor's policy also caused damages to Coby.

74.    The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Here, Plaintiff alleges that the individual officers deprived

him of liberty by affirmatively placing him at greater risk of injury thus his claims are rooted in the substantive component of the Due Process Clause. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 194-95, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

75.    A governmental entity is liable for the injuries due to the fact that a special relationship between the plaintiff and Tombstone gives rise to a constitutional duty to protect. *See DeShaney*, 489 U.S. at 198-202, 109 S.Ct. 998.    Tombstone may be constitutionally required to protect a plaintiff that it "affirmatively places ... in danger by acting with `deliberate indifference' to a `known or obvious danger.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971-972 (9th Cir. 2011) (*quoting L.W. v. Grubbs,* 92 F.3d 894, 900 (9th Cir. 1996)); *see also Kennedy v. City of Ridgefield*, *439 F.3d 1055, 1063 (9th Cir. 2006).*

76.    The state-created danger doctrine applies because Defendants affirmatively exposed Coby to a greater risk of a known danger as the Defendants'' affirmative actions created or exposed her to an actual, particularized danger that she would not otherwise have faced, the injury from an unsafe dog was foreseeable, and the Defendants were deliberately indifferent to the known danger. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018).

77.    As a result, Plaintiff was injured.

**COUNT TWO**
**42 U.S.C. 1985**
**(Defendants Adams, Baker, Sharp, Garcia, and McKweon)**

78.    Plaintiff adopts and incorporates all the preceding paragraphs.

79.    42 U.S. Code § 1985 will also apply here as Baker and/or Sharp and/or Adams and/or Garcia and/or McKeowen and/or others conspired with each other to place Coby in a situation where he was harmed. This applies when two or more persons conspire to deny a person "any right or privilege of a citizen of the United States." 42 U.S.C. § 1985. To state a conspiracy claim, a plaintiff "must show `an agreement or `meeting of the minds' to violate constitutional rights." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002).

80.    Given the intentional cover-up to place dangerous dogs in the hands of plaintiff, Defendants violated the law and deprived Coby of his right to be free from injury and thus the violation of the Fourteenth Amendment.

81.    Plaintiff was injured by Defendants' actions.

**COUNT THREE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

82.    Plaintiff adopts and incorporates all the preceding paragraphs.

83.    Here, the intentional infliction of emotional distress given that the people involved "caused severe emotional distress by extreme and outrageous conduct committed with the intent to cause emotional distress or with reckless disregard of the

near-certainty that such distress would result." *See Watkins v. Arpaio*, 239 Ariz. 168, 170-71, ¶ 8 (App. 2016).

84.    Plaintiff suffered physical injuries due to the emotional distress caused by the actions of the Defendants including but not limited to headaches, body aches, sleep issues, and other pain caused by the emotional distress of the various dogs and the attacks followed by the false statements made against him and/or the threats to fire him.

## COUNT FOUR
## GROSS NEGLIGENCE

85.    Plaintiff adopts and incorporates all the preceding paragraphs.

86.    "Ordinarily, the issue of gross negligence is a question of fact to be decided by the jury." *Walls v. Arizona Dep't of Pub. Safety*, 170 Ariz. 591, 595, 826 P.2d 1217, 1221 (App. 1991). Here, due to their relationship with Coby, placing a dog with him that Defendants knew or should have known had caused injury, and then working to blame Coby for the injuries, was a breach of the duty to him.

87.    As a direct and proximate result of Defendants' actions, Plaintiff suffered damages as set forth herein.

## COUNT FIVE
## FRAUD
## (Defendants Baker, C. Via, A. Via, KnightWatch K9 LLC, All Phase K9 Tactical, Got Your Six K9 Rescue, Inc.)

88.    Plaintiff re-alleges and incorporates herein all allegations contained in above paragraphs.

89.     Arizona recognizes aiding and abetting as embodied in Restatement § 876(b), that a person or company who aids and abets a tortfeasor is itself liable for the resulting harm to a third person. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 38 P.3d 12, 28, ¶¶ 66-67 (Ariz. 2002).

90.     Defendants committed common law fraud: (1) a representation- that the dogs sold to Tombstone and placed with Coby were suitable for the job; (2) its falsity- they knew that the representation was untrue as evidenced by changing records and failing to disclose the dogs' histories; (3) its materiality- the representations were material to having a police dog with the handler; (4) the speaker's knowledge of its falsity or ignorance of its truth- Defendants knew the representations were false; (5) the intent that it should be acted upon by and in the manner reasonably contemplated- they intended to have Tombstone purchase the dogs; (6) the hearer's ignorance of its falsity-Plaintiff was unaware of the dogs' histories; (7) he relied on the truth; (8) he had a right to rely thereon; and (9) he suffered consequent and proximate injury. *Nielson v. Flashberg,* 101 Ariz. 335, 419 P.2d 514 (1966).

91.     A person can be  required to disclose information when the person knows  a fraud is being committed.'" *Burkons v. Ticor Title Ins. Co.*, 168 Ariz. 345, 353, 813 P.2d 710, 718 (1991) (*quoting Berry v. McLeod,* 124 Ariz. 346, 352, 604 P.2d 610, 616 (1979)).

22

92.     Defendants intentionally changed the records of various dogs including at least two that were given to Plaintiff or the K9 program so that Tombstone and Coby would not know of their histories which included Hawk attacking a prior handler.

93.     Plaintiff has been damaged by the fraud.

## COUNT SIX
### NEGLIGENCE/NEGLIGENT MISREPRESENTATION
**(Defendants Baker, A. Via, C. Via, KnightWatch K9 LLC, All Phase K9 Tactical, Got Your Six K9 Rescue, Inc.)**

94.     Plaintiff re-alleges and incorporates herein all allegations contained in above paragraphs.

95.     Defendants, based on their knowledge that dogs were being supplied to police handlers, failed to provide accurate information and knowledge and in fact provided false information, failing their duty not to provide false information.

96.     Defendants breached that duty when they were involved in providing dogs to Tombstone that were known to be dangerous.   Supplying the dog with wrong information and failing to disclose information caused Plaintiff to be injured.

97.     "Unlike simple nondisclosure, a party may be liable for acts taken to conceal, mislead or otherwise deceive, even in the absence of a fiduciary, statutory, or other legal duty to disclose." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 483, ¶ 19, 38 P.3d 12, 21 (2002); see Restatement (Second) of Torts § 529 (1977) ("Restatement Second") ("A representation stating the truth so far as it goes but which the maker knows or believes to

be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation.").

98.    Plaintiff was damaged by the actions of the Defendants.

## COUNT SEVEN
### FRAUDULENT CONCEALMENT
**(Defendants Baker, C. Via, A. Via, KnightWatch K9, All Phase K9 Tactical, and Got Your Six K9 Rescue, Inc.)**

99.    Plaintiff re-alleges and incorporates herein all allegations contained in above paragraphs.

100.    Defendants committed fraudulent concealment, which occurs when a party to a transaction conceals or by other action intentionally prevents the other party from acquiring material information. W*ells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 496, ¶ 87 (2002).

101.    Defendants here concealed the histories of the dogs so that Coby would not know the dangers.

102.    Plaintiff was damaged by the schemes defendants participated in.

## COUNT EIGHT
### DEFAMATION/DEFAMATION PER SE
**(Defendants Baker, Sharp and McKeown)**

103.    Plaintiff re-alleges and incorporates herein all allegations contained in above paragraphs.

104.    To recover for defamation, a plaintiff must prove (1) that the defendant made a false statement, (2) that the statement was defamatory, and (3) that the defendant

published the statement to a third party, (4) with the requisite level of fault, (5) causing damages. *See Dombey v. Phx. Newspapers, Inc.,* 150 Ariz. 476, 480-81 (1986); *Peagler v. Phx. Newspapers, Inc.*, 114 Ariz. 309, 315-16 (1977).

105.   Plaintiff as a private figure needs only prove the defendant negligently published the statement. *Dombey*, 150 Ariz. at 480-81, 487. Damages may be presumed for statements that are defamatory per se, or facially defamatory. *See Boswell v. Phx. Newspapers, Inc.,* 152 Ariz. 1, 6 n.4 (App. 1985) (supplement by 152 Ariz. 9 (1986))

106.   A statement is defamatory per se when its defamatory character is apparent on its face because the words used are "of such a nature that the court can presume as a matter of law that the communication will tend to degrade or disgrace the party defamed." *McClinton v. Rice*, 76 Ariz. 358, 365 (1953).  Claims made about how Mr. Coby treated his dog are defamatory.

107.   These claims were published not only to internal employees but to outside people. For example, Defendant Baker is believed to have made public statements at a canine expo where she told a citizen identified by his Facebook screen name Hans Alpine who posted in a Facebook chat group titled Leo Canine Discussion "I would like to add that the vendor is an experienced vendor who placed successfully dogs with LE before, and that this was the second dog who this handler (Coby) failed in a 1 month (I was told) and the dog was only in possession of his handler for 1 week when the incident happened." Defendant Sharp is also a member of the Facebook group chat titled LEO Canine discussions where he took a screen shot and posted a Article in a text message

chat group on November 26th 2024 with the first sentence of the article saying accidental bites are always 100%, unequivocally the handlers fault."  Defendant McKeown made false statements about Plaintiff mishandling his work dog.

108.    Plaintiff was damaged by the actions of the Defendants in violation of law.

## PUNITIVE DAMAGES

109.    As allowable under the law, the various individuals "engaged in tortious conduct of any kind, intentional or negligent—that is, acted with an `evil hand,'" and that "the defendant engaged in such conduct with an `evil mind.'" *Swift Transp. Co. of Ariz. L.L.C. v. Carman in & for Cnty. of Yavapai,* 253 Ariz. 499, 506, ¶ 22 (2022).

110.    Falsifying of records to place a dog into law enforcement knowing its history and others working with Baker to cover it up. The conduct shocks the conscience depriving Mr. Coby was seriously injured due to the lies and cover-ups that subjected him to dogs that were known by Baker to have a history.

**PRAYER FOR RELIEF:**

WHEREFORE, for the foregoing reasons, Plaintiff requests the following against all Defendants:

A.    Judgment in favor of Plaintiff in an amount to be proven at trial, including special damages, compensatory damages, loss of income, emotional damages; loss of wages, present and future, pain and suffering; and diminution in earning capacity;

B.    Pre and post judgment interest at the highest permissible rate;

C.    Punitive Damages;

D.      Reasonable attorneys' fees and costs to the extent allowed under State and Federal law;

E.      Trial by jury as to all issues so triable; and,

F.      For such relief to which Plaintiff is entitled and is just and proper.

DATED this 15th day of May, 2025.

By: /s/ Kimberly A. Eckert
Law Offices of Kimberly A. Eckert
Attorney for Plaintiff

27